## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| ELEANOR SPICER, ) | |
| ) | |
| Plaintiff, ) | No. 3:06 CV 1685 (SRU) |
| ) | |
| v. ) | |
| ) | |
| YALE UNIVERSITY, and ) | January 26, 2006 |
| WILLIAM H. KONIGSBERG ) | |
| ) | |
| Defendants. ) | |

### FIRST AMENDED COMPLAINT

Plaintiff, complaining of Defendants, respectfully alleges and says as follows:

### PARTIES

1.     Plaintiff Dr. Eleanor Spicer ("Plaintiff") is an adult individual citizen of South Carolina, domiciled at 304 N. Hobcaw Drive, Mount Pleasant, South Carolina 29464.

2.     Upon information and belief, Defendant Yale University ("Yale") is a private college and corporation and is organized and exists under and by virtue of a charter granted by the General Assembly of the Colony and State of Connecticut, and maintains its principal place of business in New Haven, Connecticut 06520.

3.     Upon information and belief, Defendant William H. Konigsberg ("Konigsberg") is an adult individual residing in the State of Connecticut.

### JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because there exists complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. This Court also possesses subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United States.

5.    This Court possesses personal jurisdiction over this matter because the Defendants have sufficient contacts with the State of Connecticut.

6.    Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) inasmuch as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

## FACTS COMMON TO ALL COUNTS

7.    Plaintiff is a professor in the Department of Biochemistry and Molecular Biology at the Medical University of South Carolina.

8.    Plaintiff has been involved and participated in research and other intellectual activity performed under the auspices of Yale.

9.    This lawsuit involves a tissue factor cloning project ("Project"), a joint collaboration between Plaintiff, Konigsberg, Yale Nemerson and Ronald R. Bach, which occurred between December, 1985 and October, 1987.

10.    The Project involved the isolation and sequencing of cDNA clones and the cloning of human factor.

11.    cDNA is "complementary DNA," or single-stranded DNA that is complementary to messenger RNA or DNA that has been synthesized from messenger RNA by reverse transcriptase, an enzyme that is able to copy genetic information from RNA to DNA.

12.    Tissue factor is a substance present in endothelial tissue, platelets, and leukocytes necessary for the initiation of thrombin formation from the zymogen prothrombin.  Thrombin formation ultimately leads to the coagulation of blood.

13.    Plaintiff worked primarily with Defendant Konigsberg at Yale School of Medicine.

14.    Plaintiff's contributions to the Project included, but was not limited to, the following:

(a)    Plaintiff worked with Defendant Konigsberg in reviewing amino acid sequences and designing suitable probes and selecting an appropriate cDNA library for screening.

(b)    Plaintiff and Defendant Konigsberg supervised and directed the work of others, who performed work purifying and reconfirming specificity of

2

potential positive clones and were then involved in the sequencing of two clones that were isolated and believed to encode human factor.

(c)     Along with others, Plaintiff read the sequencing gels run by others and recorded the results.

(d)     Along with others, Plaintiff entered the data into a networked VAX computer, which generated printouts comparing regions of sequence identity among clone fragments and compiling the sequence of the clone fragments sequentially to yield the nucleotide sequence of the entire clone.

(e)     Along with others, Plaintiff constructed restriction maps based upon actual nucleotide sequence to demonstrate the relationship of the clone fragments to each other and to predict the actual structure of the encoded human tissue factor.

(f)     Plaintiff constructed a map of the length and portion of tissue factor protein encoded by tissue factor subclones, based on nucleotide sequence information, tissue factor peptide sequence information, and restriction mapping information, and cross-hybridization of tissue factor subclones to specific probes.

(g)     Plaintiff printed a computer listing of the nucleotide sequence of the λ10, 3 clone that was isolated in October, 1986, which encodes full-length, mature human tissue factor protein from amino acid 1 to amino acid 263.

15.     As a result of the work done by Plaintiff, Konigsberg and others, the Project yielded the cloning of human factor ("Invention")

16.     Plaintiff, through her essential contributions to the Project, was a joint inventor of the Invention.

17.     Yale has had, at all relevant times, a Yale University Patent Policy ("Patent Policy") in effect.

18.     Upon information and belief, Plaintiff's rights with regard to the Invention are governed by the Patent Policy.

19.     "The [Yale] University Patent Policy states the procedure to be followed in the administration of inventions which result from teaching, research, and other intellectual activity performed under [Yale] University auspices." (See Yale Patent Policy § 1).

3

20.    The Yale Patent Policy states that its purposes include "defin[ing] remuneration to the inventor or inventors (hereinafter the "Inventor") and the University as long as the invention is productive of royalties." (See Yale Patent Policy § 2(a)).

21.    The Yale Patent Policy further states, with regard to the division of royalties between Yale and inventors, that:

> c) Net Royalties. After recovery of expenses by the University[,] . . . the remaining royalties will be designated Net Royalties.
>
> d) Distribution of Net Royalties. The Net Royalties as defined above shall be divided between the Inventor(s) (as defined under the patent law) and the University as follows:
>
> The first $100,000 of Net Royalties
>
> > 50% to the Inventor(s)
> >
> > 50% allocated to the general support of University research, as described in paragraph 5.
>
> Net Royalties between $100,000 and $200,000
>
> > 40% to the Inventor(s)
> >
> > 60% allocated to the general support of University research, as described in paragraph 5.
>
> Net Royalties exceeding $200,000
>
> > 30% to the Inventor(s)
> >
> > 70% allocated to the general support of University research, as described in paragraph 5.
>
> For purposes of applying the above Net Royalty distribution formula (i.e., whether aggregate Net Royalties are $100,000 or less, between $100,000 and $200,000, or more than $200,000), equity shall be deemed to have the per-share value agreed upon in a good-faith negotiation between the University and the licensee at the time the license agreement is executed, and the equity shall be deemed received after all cash Net Royalties received at or before the time the equity is issued. In the absence of such negotiated value, the Inventors shall receive 32% of the equity Net Royalties.

In its discretion, the University may either distribute equity to the Inventor(s) when it is received or arrange for the licensee to issue the Inventor's share of equity directly to the Inventor(s).

As used in this document, the term "Inventor" may represent two or more individuals. These individuals will be expected to agree among themselves on the fractional distribution of the "Inventor" share of any royalties. A written agreement must be signed by all the individuals involved, and deposited for the record in the Office of Cooperative Research. (Appropriate forms are available from the Office of Cooperative Research.) If no written agreement has been deposited at the time of a distribution of Net Royalties, the Inventors' share of such distribution shall be divided equally among the Inventors.

e) Overriding Agreements with Third Parties. The foregoing provisions of this paragraph and the rest of this University Patent Policy are subject to the terms of applicable grants and contracts with third parties. See paragraph 7.

(See Yale Patent Policy § 4).

22.    On or about November 19, 1996, Plaintiff executed an Assignment ("1996 Assignment"), a copy of which is attached hereto as Exhibit A.

23.    In the 1996 Assignment, Plaintiff assigned to Yale her entire interest in "a certain invention or improvement in 'Cloning and Expression of Human Tissue Factor' described in U.S. Serial No. 07/732,991, filed July 18, 1991."

24.    Plaintiff further agreed in the 1996 Assignment to permit Yale to perform any acts necessary to secure the grant of a patent for the subject-matter thereof.

25.    On or about October 14, 2003, Plaintiff executed another Assignment ("2003 Assignment"), a copy of which is attached hereto as Exhibit B.

26.    In the 2003 Assignment, Plaintiff agreed to assign to Yale (the "Assignee") all of her rights in:

a certain invention or improvement in "CLONING AND EXPRESSION OF HUMAN TISSUE FACTOR" described in U.S. Serial No. 08/473,262 filed in the United States Patent and Trademark Office on June 7, 1995 by Yale Nemerson and William H. Konigsberg which is a divisional of U.S.S.N. 08/297,895, filed August 29, 1994, which is a divisional of U.S.S.N. 07/732,991, filed July 19, 1991, which is a continuation of U.S.S.N. 07/632,616, filed December 26, 1990, which is a continuation of U.S.S.N. 07/208,895, filed June 17, 1988, which is a continuation in-part of U.S.S.N. 07/062,166, filed June 27, 1987, and in all Letters patent of the United States and its territories and all foreign countries and jurisdictions which may

5

or shall be granted on said invention, or any parts thereof, or on said application, or on any provisional, divisional, continuation, continuation-in-part, reissue, or other applications based in whole or part thereon. And I agree, for myself and my executors and administrators, with said Assignee and its successors and assigns, but at its or their expense or charges, hereafter to execute all applications, amended specifications, deeds or other instruments, and to do all acts necessary or proper to secure the grant of Letters Patent in the United States and its territories and in all other foreign countries and jurisdictions to said Assignee, with specifications and claims in such form as shall be approved by counsel of said Assignee, and to vest and confirm in said assignee, its successors and assigns, the legal title to all such patents.

27.    In accordance with all Yale policies and procedures, Plaintiff has assigned her rights in the Invention to Yale and has actively participated in Yale's efforts to obtain patent protection for the Invention.

28.    Upon information and belief, one or more entities have paid Yale royalties and/or licensing fees in return for a license to use the Invention (the "Royalties").

29.    Defendants have never disputed or denied that Plaintiff was an inventor of the Invention; in fact, on numerous occasions Defendants have asserted that Plaintiff is an inventor of the Invention.

30.    Defendants have never disputed or denied that Plaintiff is entitled to a percentage of royalties paid for the Invention; in fact, on numerous occasions, Defendants have admitted that Plaintiff is entitled to receive a percentage of royalties received by Yale in connection with the Invention.

31.    Upon information and belief, Konigsberg has been paid a portion of the Royalties received by Yale; however, Konigsberg has never shared his portion of the Royalties with Plaintiff.

32.    Upon information and belief, a portion of the Royalties paid to Konigsberg in connection with the Invention should have been paid to Plaintiff.

33.    On numerous occasions, Plaintiff attempted, unsuccessfully, to agree upon a formula for the distribution of royalties among herself and Konigsberg.

34.    To date, Plaintiff has never been paid any Royalties in connection with her involvement and contribution to the Invention.

## FOR A FIRST CAUSE OF ACTION

## BREACH OF CONTRACT

### *Plaintiff v. All Defendants*

35.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 34 above, as if fully set forth herein.

36.     Pursuant to the Patent Policy, Plaintiff had an enforceable contract with Yale governing the distribution of royalties and revenues received from inventions to which she contributed.

37.     The relevant terms of this contract are set forth, in part, in Yale's Patent Policy.

38.     Under this contract, in return for Plaintiff's contribution to the Invention and assignment of her rights to the Invention to Yale, she would share in a percentage of the Royalties paid to Yale in connection with the Invention.

39.     Under the Yale Patent Policy, Plaintiff was entitled to receive a percentage of the Royalties paid to Yale in connection with the Invention.

40.     Plaintiff also had an oral or written contract with Konigsberg, which governed the distribution of the "inventors' share" of Royalties from the Invention among Plaintiff and Konigsberg.

41.     Plaintiff was entitled to receive a percentage or share of the Royalties paid to Yale — and through Yale to Konigsberg — in connection with the Invention.

42.     Plaintiff has never received any Royalties in connection with the Invention.

43.     Plaintiff has fully performed her duties and obligations under her agreements with Yale and Konigsberg, by contributing to the Invention, executing assignments of her rights to the Invention to Yale, and participating in Yale's efforts to obtain patent protection for the Invention.

44.     For example, Plaintiff gave depositions and assisted Yale's counsel in reviewing voluminous documents in connection with interference proceedings relating to the Invention.

45.     Moreover, Plaintiff provided her scientific expertise to assist Yale in asserting its positions in the interference proceedings.

7

46.     Yale and Konigsberg accepted the benefits of Plaintiff's performance under these agreements.

47.     Defendants breached their agreements with Plaintiff by failing to pay her any percentage of Royalties paid to Yale.

48.     Plaintiff has sustained injuries and harm as a direct and proximate result of Defendants' breaches of their contracts with her.

49.     Plaintiff is entitled to damages for breach of contract, in an amount to be established at trial, plus costs and attorneys fees.

### FOR A SECOND CAUSE OF ACTION

### QUANTUM MERUIT

### *Plaintiff v. All Defendants*

50.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 49 above, as if fully set forth herein.

51.     Without regard to whether a contract(s) existed between Plaintiff and Defendants — or the terms of such contract(s) — Plaintiff provided benefits and value to Defendants in the conception of the Invention.

52.     For example, Plaintiff contributed her labor, knowledge, training, experience and expertise toward the Invention, her assignment of her rights to the Invention to Yale, and her active participation in Yale's efforts to obtain patent protection for the Invention.

53.     Defendants accepted and retained these benefits from Plaintiff; in fact, Defendants have received direct monetary benefits, in the form of Royalties, in part as a result of the Plaintiff's contribution to the Invention.

54.     Defendants are still receiving continuing financial benefits from Plaintiff's contribution to the Invention in the form of continuing Royalties.

55.     Plaintiff rendered the value and benefits set forth above with the reasonable expectation that she would receive a share of Royalties generated by the Invention.

56.     Under the circumstances, it is inequitable that Defendants retain the benefits and value bestowed by Plaintiff, without compensating her.

57.     To date, Defendants have not made any payments to or otherwise compensated Plaintiff for her contributions to the Invention and the Royalties that the Invention has generated.

58.     Therefore, under the theory of unjust enrichment or quantum meruit, Defendants should compensate Plaintiff for the benefits and value set forth above.

### FOR A THIRD CAUSE OF ACTION

### PROMISSORY ESTOPPEL

#### *Plaintiff v. All Defendants*

59.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 58 above, as if fully set forth herein.

60.     Defendants made unambiguous promises to Plaintiff that she would receive an appropriate percentage of the inventors' share of Royalties paid to Yale in connection with the Invention.

61.     Moreover, Konigsberg told Plaintiff that he had not received royalties in connection with the Invention, when he, in fact, had.

62.     Plaintiff acted in reasonable reliance upon these promises, in general and in the following particulars, inter alia:

(a)     Providing her education, training, knowledge and expertise to assist in the creation of the Invention;

(b)     Assigning her rights to the Invention to Yale;

(c)     Providing assistance to Defendants' efforts to obtain patent protection for the Invention;

(d)     Refraining from bringing legal action against Defendants, in the belief that she would be paid a percentage of Royalties; and

(e)     Otherwise acting to further the development, marketing or protection of the Invention.

63.    These acts of reliance by Plaintiff constituted a definite and substantial detrimental action or forbearance.

64.    Such reasonable reliance by Plaintiff was expected and foreseeable by Defendants.

65.    Plaintiff sustained injury as a direct and proximate result of her reliance upon Defendants' promises.

## FOR A FOURTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

### *Plaintiff v. All Defendants*

66.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 65 above, as if fully set forth herein.

67.    Defendants have made numerous misrepresentations to and concealments from Plaintiff relating to the Invention and the Payment of Royalties to Plaintiff.

68.    For example, on numerous occasions, Defendants have specifically misrepresented to Plaintiff that she would receive a percentage of Royalties received in connection with the Invention.

69.    Moreover, Defendants concealed from Plaintiff the fact that they had received royalties in connection with the Invention.

70.    Defendants failed to exercise reasonable care when making the above-referenced representations and concealments, to determine the truth or accuracy thereof.

71.    Defendants made these misrepresentations and concealments with the intention that Plaintiff would rely thereon.

72.    Plaintiff, in fact, relied upon these misrepresentations and concealments.

73.    Such reliance was reasonable under the circumstances.

74.    As a direct and proximate result of her reliance upon Defendants' misrepresentations and concealments, Plaintiff has sustained damages.

## FOR A FIFTH CAUSE OF ACTION

## FRAUDULENT MISREPRESENTATION

### *Plaintiff v. Defendant Konigsberg*

75.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 74 above, as if fully set forth herein.

76.    Defendant Konigsberg has made numerous misrepresentations to and concealments from Plaintiff relating to the Invention and the Payment of Royalties thereupon, including (but not limited to) the following:

(a)    In October of 2003, Defendant Konigsberg stated or suggested to Plaintiff, in one or more telephone conversations, that neither he nor Yale has received any royalties to date as a result of the Invention.

77.    Defendant Konigsberg made the above-referenced fraudulent misrepresentations knowing them to be untrue.

78.    Defendant Konigsberg made these fraudulent misrepresentations with the intention that Plaintiff would rely thereon.

79.    Plaintiff, in fact, relied upon these fraudulent misrepresentations.

80.    Such reliance was reasonable under the circumstances.

81.    As a direct and proximate result of her reliance upon Defendant Konigsberg's fraudulent misrepresentations and concealments, Plaintiff has sustained damages.

WHEREFORE, for all of the foregoing reasons, Plaintiff prays judgment against Defendants for such amount of actual damages, exceeding the sum of Seventy-Five Thousand Dollars ($75,000.00), and punitive damages as to be determined by a jury, along with attorney's fees, costs, and such other and further relief as this Court deems just and proper.

**JURY TRIAL DEMANDED.**

Respectfully Submitted

BY:     /s/ Frank W. Murphy
        Frank W. Murphy **(CT 05317)**
        Tierney, Zullo, Flaherty & Murphy, P.C.
        134 East Avenue
        Norwalk, CT 06851
        P: (203)853-7000
        F: (203)838-4829
        Email:attymurphy1@sbcglobal.net


        and

        OF COUNSEL:


BARNWELL WHALEY PATTERSON & HELMS, LLC

BY:     /s/ B. Craig Killough
        B. Craig Killough, Esq. (Fed. ID No. 2330)
        John William Fletcher (Fed. ID No. 9378)
        885 Island Park Drive (29492)
        Post Office Drawer H
        Charleston, SC  29402
        (843) 577-7700
        (843) 577-7708 (fax)
        **ATTORNEYS FOR PLAINTIFF**

DATED:  January 26, 2007

## Certificate of Service

I hereby certify that on January 26, 2006, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

For the Defendant:

Jonathan M. Freiman
Iris Gafni-Kane
Wiggin and Dana
P. O. Box 1832
New Haven, CT 06508-1832

/s/   Frank W. Murphy